

# NUMBERS
## 13-14-00183-CR
## 13-14-00184-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**JAMES THOMAS JONES II,**                                      **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                      **Appellee.**

---

**On appeal from the 221st District Court
of Montgomery County, Texas.**

---

# OPINION

**Before Justices Benavides, Perkes, and Longoria
Opinion by Justice Longoria**

By two issues, appellant, James Thomas Jones II, challenges his conviction for

possession with intent to deliver 2.62 pounds of cocaine and possession of 76 pounds of

marijuana.  *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.112(f); 481.121(b)(5) (West, Westlaw through 2013 3d C.S.).  We affirm.[1]

## I. BACKGROUND

On April 29, 2013, a group of ten Texas Highway Patrol officers performed a drug interdiction at a bus station located in front of a gas station on Frazier Street in Conroe, Texas.  The officers were not in uniform but most wore body armor with markings identifying them as police and displayed their badges on chains around their necks.  Some of the officers wore visible sidearms.  Officer Brian Inhen ("Inhen")[2] was there with his trained drug-detection dog, Femke. Inhen testified that his role in these types of operations was to "run" Femke over the luggage that had already been loaded onto the bus to see if Femke would alert to the presence of illegal narcotics.  Inhen does not usually run Femke on people because she bites, scratches, and attempts to jump when she alerts.  In contrast to the other officers present, Inhen was in full uniform with a sidearm visible on his belt.

Appellant was standing near the gas pumps with three new-looking suitcases. Lieutenant Kyle Matheson ("Matheson") approached appellant and "struck up a conversation with him."  Matheson testified that he talked with appellant for "maybe a minute" about his travel plans.  Appellant told him that he was headed to Tyler, Texas, and then onto Meridian, Mississippi.  Matheson discovered that the name on the bus ticket did not match appellant's name.  Matheson identified himself as a police officer and

---

[1] This case is before this Court on transfer from the Ninth Court of Appeals in Beaumont pursuant to a docket-equalization order issued by the Supreme Court of Texas.  *See* TEX. GOV'T CODE ANN. § 73.001 (West, Westlaw through 2013 3d C.S.).

[2] Officer Inhen is referred to as "Ihnen" in the reporter's record.  We will assume that is a transcription error and use the spelling in the parties' briefs.

2

explained what the officers were doing. At this time, Inhen and Femke came around the back of the bus from where Inhen had parked on the other side. Inhen stated that when appellant saw Inhen and Femke, appellant "gave me like a blank stare" and then immediately looked away. Inhen approached appellant and Matheson backed several feet away.

While Inhen approached, Femke began to alert on appellant by sniffing the air and looking around. Inhen asked appellant for his identification as Femke became more agitated. Inhen asked appellant if he had any illegal narcotics on his person. Appellant denied that he was carrying any, but he agreed to Inhen's next request to empty his pockets. While appellant was in the process of emptying his pockets, Femke's alert strengthened, and she attempted to bite, scratch, and jump on appellant. Inhen noticed a bulge in the watch pocket of appellant's pants and thought that appellant was trying to cover it. At this time, Inhen touched the bulge and "knew it was marijuana." Inhen removed the bulge from appellant's pants pocket and discovered it to be a sealed bag containing 6.5 grams of marijuana. Inhen told appellant to drop the bags he was carrying. The officers searched the bags and recovered 76 pounds of marijuana and 2.62 pounds of cocaine.

Appellant made a motion to suppress on the grounds that the dog sniff was a search under the Fourth Amendment and that it was not supported by reasonable suspicion. He also asserted that he was detained without reasonable suspicion from the onset of the encounter. The trial court judge denied the motion. Appellant unsuccessfully reurged his motion before the jury during the trial.[3] The jury returned a verdict of guilty

_____

[3] Because the parties reurged the suppression issue before the jury, we take the foregoing facts both from the evidence presented to the judge during the suppression hearing and the evidence presented

3

on both counts. *See id.* The trial court judge assessed concurrent sentences of thirty-five years' imprisonment in the Texas Department of Criminal Justice—Institutional Division.

## II. STANDARD OF REVIEW FOR A MOTION TO SUPPRESS

We review a trial court's ruling on a motion to suppress using a bifurcated standard of review. *State v. Kerwick*, 393 S.W.3d 270, 273 (Tex. Crim. App. 2013). We give almost total deference to the trial judge's determination of historical facts and of mixed questions of law and fact that rely on credibility determinations if they are supported by the record. *Id.* When, as here, the trial court does not issue findings of fact, we imply all necessary findings in support of the trial court's ruling if the evidence, viewed in the light most favorable to the ruling, supports those findings. *State v. Kelly*, 204 S.W.3d 808, 819 (Tex. Crim. App. 2006). However, we review de novo questions of law and mixed questions of law and fact which do not rely on credibility determinations. *Kerwick*, 393 S.W.3d at 273. We afford the party that prevailed in the trial court the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *Wade v. State*, 422 S.W.3d 661, 666–67 (Tex. Crim. App. 2013). We will uphold the trial court's ruling if it is reasonably supported by the record and correct on any applicable theory of law. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013).

## III. WAS THE DOG SNIFF AN UNREASONABLE SEARCH?

By his first issue, appellant argues that Femke's sniff of his person was a search under the Fourth Amendment, and that the search was not supported by reasonable

---

to the jury during the trial on the merits. *See Black v. State*, 362 S.W.3d 626, 635 (Tex. Crim. App. 2012) (observing that the court of appeals' review of a trial court's ruling on a motion to suppress is not limited to the record before the court at the time of the suppression hearing when the issue is consensually reurged in front of the jury).

4

suspicion. Appellant's issue actually presents two questions: whether the sniff of appellant's person was a search governed by the Fourth Amendment and, if so, whether the search was reasonable.

We first address whether the dog sniff of appellant's person was a search. A "search" within the meaning of the Fourth Amendment occurs "when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001). If the defendant's expectation of privacy was not one society was prepared to recognize as legitimate, then the Fourth Amendment provides no protection. In the words of the Texas Court of Criminal Appeals:

> a 'legitimate' expectation of privacy by definition means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as 'legitimate.'

*State v. Granville*, 423 S.W.3d 399, 407 (Tex. Crim. App. 2014) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978)). The United States Supreme Court has ruled that there is no legitimate expectation of privacy in the possession of contraband such as illegal narcotics. *Illinois v. Caballes*, 543 U.S. 405, 408 (2005) (citing *United States v. Jacobsen*, 466 U.S. 109, 123 (1984)). Therefore, "governmental conduct that *only* reveals the possession of contraband compromises no legitimate privacy interest" and is not a "search" for purposes of the Fourth Amendment. *Id.* (citing *Jacobsen*, 466 U.S. at 123); *see State v. Dobbs*, 323 S.W.3d 184, 188 n.11 (Tex. Crim. App. 2010). Applying this principle, the *Caballes* Court held that because a dog sniff could reveal only the presence of contraband, and there is no legitimate privacy interest in the possession of contraband, a sniff by a trained drug-detection dog of the exterior of a vehicle was "generally" not a

5

Fourth Amendment search. *Caballes*, 543 U.S. at 409. In similar cases involving dog sniffs of vehicles, the Texas Court of Criminal Appeals and the courts of appeals have held that officers initiating a dog sniff must only "have the right to be where they are at the time they initiate a dog sniff." *State v. Weaver*, 349 S.W.3d 521, 529 (Tex. Crim. App. 2011); *accord Branch v. State*, 335 S.W.3d 893, 900 (Tex. App.—Austin 2011, pet. ref'd); *Johnson v. State*, 323 S.W.3d 561, 564 (Tex. App.—Eastland 2010, pet. ref'd). Our research has not revealed any Texas state cases evaluating the dog sniff of a person outside of the context of a vehicle or a home,[4] but the Fifth Circuit Court of Appeals has twice addressed the issue. In *Horton v. Goose Creek Independent School District*, the court held that intentional dog sniffs where the dogs' noses touched the bodies of the students was a "search" within the meaning of the Fourth Amendment. 690 F.2d 470, 479 (5th Cir. 1982). The *Horton* Court reasoned that "intentional close proximity sniffing of the person" was a Fourth Amendment search, but reserved for another case the question of whether "the use of dogs to sniff people in some other manner, e.g., at some distance, is a search." *Id.* The Fifth Circuit later held that a sniff by a narcotics-detection dog "four to five feet away" from the defendant when the dog handler did not intend for

---

[4] The United States Supreme Court recently decided that police officers violated the Fourth Amendment when they ran a drug dog in the area immediately surrounding the defendant's house and the dog alerted on the defendant's front door. *Florida v. Jardines*, 133 S.Ct. 1409, 1413 (2013). However, the holding in that case is based on the special protection the Fourth Amendment law affords to a person's home and the curtilage, the area immediately surrounding and associated with it. *Id.* at 1414. Because the officers' investigation took place in this protected area and they had no license to be there, the sniff was an unreasonable search. *Id.* at 1415–16. The Court expressly based its holding on the defendant's property rights and stated that it was not considering whether the sniff violated the defendant's legitimate expectations of privacy. *Id.* at 1417. The Court distinguished *Caballes*, *United States v. Place*, 462 U.S. 696 (1983), and *United States v. Jacobsen*, 466 U.S. 109 (1984), as relying on the "reasonable expectations of privacy" test that was not at issue in the case. *Id.* Accordingly, *Jardines* is not relevant to this case because appellant was not on his property at the time. *See id.*

6

the dog to sniff the defendant was not a Fourth Amendment search. *United States v. Reyes*, 349 F.3d 219, 224 (5th Cir. 2003).

Appellant argues that this case is different from *Reyes* because Inhen intended for Femke to sniff appellant, or at least Inhen knew that Femke sniffing appellant was a natural consequence of walking over to him accompanied by Femke. By contrast, the dog handler in *Reyes* was simply waiting for the passengers to exit the bus so that he could run his dog through the passenger compartment. *Id.* at 223.

Assuming for the sake of argument that Inhen intended for Femke to sniff appellant, we have found no authority that the officer's intention in performing an action determines whether it is a search for purposes of the Fourth Amendment. A governmental action is a "search" governed by the Fourth Amendment when it compromises a citizen's legitimate expectation of privacy. *Caballes*, 543 U.S. at 408; *Kyllo*, 533 U.S. at 33; *Reyes*, 349 F.3d at 223. And there is no legitimate privacy interest in possessing the contraband that dogs such as Femke are trained to detect. *Caballes*, 543 U.S. at 408–09. Applying this law to the present case, we find no reason to distinguish the drug-dog sniffs approved in *Caballes* from the sniff of appellant. Similar to the vehicle sniffs approved in *Caballes*, a non-contact sniff of a person by a trained drug-detection dog generally would reveal only the presence of contraband and would not expose non-contraband items that would otherwise be hidden from view. *See Caballes*, 543 U.S. at 409 (citing *United States v. Place*, 462 U.S. 696, 707 (1983)); *see also Weaver*, 349 S.W.3d at 528. Appellant also argues that he was only "an arm's length" away from Femke as she was attempting to bite, scratch, and jump on him. While Femke may have been closer to appellant than the dog was to the defendant in *Reyes*, appellant does not argue that Femke ever touched

7

him.  All of the cases cited by the Fifth Circuit in *Horton* that found that a drug-dog sniff was a search focused on the physical contact between the dogs and the persons being sniffed, while the one case which found that it was not a search did not involve physical contact.  *See Horton*, 690 F.2d at 477–78; *see also United States v. Kelly*, 128 F.Supp.2d 1021, 1024–25 (S.D. Tex. 2001), *aff'd,* 302 F.3d 291 (5th Cir. 2002) (holding that a contact dog sniff at the national border was a search for purposes of the Fourth Amendment).  Unlike the dog sniffs at issue in *Horton*, the non-contact sniff of appellant in this case was "only minimally intrusive" because it did not involve physical contact.  *See Reyes*, 349 F.3d at 224.

In sum, because a non-contact dog sniff of a person will not reveal anything but the presence of contraband, and there is no legitimate expectation of privacy in concealing contraband, we hold that a non-contact sniff of a person in a public place by a trained drug-detection dog is generally not a search for purposes of the Fourth Amendment.  *See Caballes*, 543 U.S. at 409.  Because we have concluded that the drug dog sniff of appellant was not a search within the meaning of the Fourth Amendment, we do not need to consider whether it was reasonable.  *See* TEX. R. APP. P. 47.1.  We overrule appellant's first issue.[5]

## IV. WAS APPELLANT DETAINED BEFORE THE DOG ALERTED?

By his second issue, appellant argues that Matheson and Inhen illegally detained him before Femke alerted to the presence of narcotics.  We disagree.

---

[5] We emphasize that our holding is limited to the operative facts of this case: a non-contact sniff by a trained drug dog in a public place.  We leave for a different case the question whether a contact dog sniff such as the one in *Horton* is a search.

8

### A. Applicable Law

Texas courts have divided police-citizen interactions into three distinct types: consensual encounters, investigative detentions, and arrests. *Johnson v. State*, 414 S.W.3d 184, 191 (Tex. Crim. App. 2013). A consensual encounter between police and a citizen does not implicate Fourth Amendment protections and therefore does not require reasonable suspicion. *Id.*; *see Florida v. Bostick*, 501 U.S. 429, 434 (1991) (observing that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions"). However, a detention is a Fourth Amendment seizure that must be supported by reasonable suspicion. *Johnson*, 414 S.W.3d at 191; *State v. Castleberry*, 332 S.W.3d 460, 466 (Tex. Crim. App. 2011) (internal footnotes omitted).

Whether a person was "detained" within the meaning of the Fourth Amendment is a mixed question that we review de novo. *Vargas v. State*, 18 S.W.3d 247, 251 (Tex. App.—Waco 2000, pet. ref'd). A consensual encounter becomes a detention when an officer "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *State v. Garcia-Cantu*, 253 S.W.3d 236, 242 (Tex. Crim. App. 2008). There is no bright-line rule to guide courts in determining when a consensual encounter becomes a detention. *Wade*, 422 S.W.3d at 667. Instead, courts look at the totality of the circumstances and determine whether a reasonable person would have felt free to ignore the police officer's request or terminate the encounter. *Id.* We take into account factors such as the time, place, and other circumstances surrounding the interaction, but the most important factor is the conduct of the officers. *Castleberry*, 332 S.W.3d at 467. "At bottom the issue is whether the surroundings and the words or actions of the officer

9

and his associates communicate the message of 'We Who Must Be Obeyed.'" *Garcia-Cantu*, 253 S.W.3d at 243.

## B. Discussion

Appellant argues that he was unlawfully detained by Matheson and Inhen before Femke alerted.[6] Appellant points us to *Hunter v. State*, where the Texas Court of Criminal Appeals held that a defendant was not detained when two officers dressed in plain clothes and wearing concealed sidearms approached him to ask about his travel plans. 955 S.W.2d 102, 103 (Tex. Crim. App. 1997) (en banc). The first officer asked to see the defendant's bus ticket, returned it, and then asked to see the defendant's identification. *Id.* After the defendant replied that he did not have any identification, the officer asked if he was carrying any narcotics. *Id.* The defendant denied that he was carrying illegal drugs but agreed to permit the officer to search his luggage. *Id.* The officer specifically told the defendant that he was not required to permit the search. *Id.* Only one of the officers ever engaged with the defendant at any time, while the other stood eight to ten feet away. *Id.* The Court relied on several factors in concluding that the defendant would have felt free to decline the officer's requests and walk away: (1) the officers were in plain clothes and their weapons were not visible; (2) only one officer actually engaged with the defendant; (3) the officer returned the defendant's bus ticket; and (4) the officer specifically told the defendant that he was not required to permit the officer to look into his bag. *Id.* at 104. Appellant contrasts the facts of *Hunter* with the facts of this case: most of the officers wore vests or badges identifying themselves as police officers, Inhen

---

[6] Appellant does not contest that Femke's alert gave the officers probable cause to detain him and to search his person.

was in full uniform with a visible sidearm, and Femke was attempting to bite, scratch, and leap onto appellant. Moreover, Inhen never returned appellant's identification.

Appellant's attempts to distinguish *Hunter* are not persuasive. There were more officers present at the bus station than the two officers in *Hunter*, but there is no evidence that any officer except for Matheson and Inhen interacted with appellant or focused on him. Matheson testified that the other officers were either talking with other passengers and the bus driver, or watching the bus stop in general. Like the officer who began the encounter in *Hunter*, Matheson questioned appellant and asked to see his ticket, but he returned it to appellant. It is undisputed that Matheson did not touch appellant or block any available exit. Like the first officer in *Hunter*, Matheson backed away several feet once Inhen approached. Unlike in *Hunter*, Matheson and the other officers present wore clothing or badges identifying themselves as police officers, and Inhen was in full police uniform with a holstered sidearm. However, the mere fact that the officer questioning appellant was in uniform and displaying a sidearm is not sufficient in these circumstances to transform this interaction into a detention. *See United States v. Drayton*, 536 U.S. 194, 204–05 (2002) (holding that the "presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon"); *accord Saldivar v. State*, 209 S.W.3d 275, 284 (Tex. App.—Fort Worth 2006, no pet.) ("Police uniforms and obvious sidearms, by themselves, are not necessarily intimidating."). Matheson asked appellant whether he was carrying narcotics, but neither officer told him that they suspected him of carrying illegal drugs. *See Hunter*, 955 S.W.2d at 104 (holding that the fact that the officers asked the defendant if he was smuggling drugs but did not tell him that they suspected him of it was an indication of a consensual

encounter). Unlike in *Hunter*, Inhen did not return appellant's identification, but Femke alerted to appellant almost immediately as Inhen approached. The trial court judge observed that the entire exchange between Inhen and appellant "took seconds." Once Femke alerted on appellant, Inhen had reasonable suspicion to detain appellant to perform a search of his person. *See Matthews v. State*, 431 S.W.3d 596, 603–04 (Tex. Crim. App. 2014) ("If the dog alerts, the presence of the drugs is confirmed, and police may make a warrantless search."); *accord Ivie v. State*, 407 S.W.3d 305, 311 (Tex. App.—Eastland 2013, pet. ref'd). Inhen simply did not have time to return the license before he obtained reasonable suspicion to detain appellant. In sum, we conclude that the two officers had not detained appellant until the time Femke alerted on appellant. We overrule appellant's second issue.

## V. Conclusion

We affirm the judgment of the trial court.


NORA L. LONGORIA
Justice

Publish.
Tex. R. App. P. 47.2(b).

Delivered and filed the
19th day of February, 2015.